**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN GEORGE, | ) | CASE NO. 1:18-cv-2407 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| ANDREW SAUL, | ) | |
| *Comm'r of Soc. Sec.*, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Steven George (hereinafter "Plaintiff"), challenges the final decision of Defendant Andrew Saul, Commissioner of Social Security (hereinafter "Commissioner"), denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act"). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

**I. Procedural History**

On April 24, 2013, Plaintiff filed his application for DIB, alleging a disability onset date of

April 1, 2009. (R. 9, Transcript ("Tr.") 144-145). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 75-116). Plaintiff participated in the hearing on February 6, 2015, was represented by counsel, and testified. (Tr. 40-74). On April 3, 2015, the ALJ found Plaintiff not disabled. (Tr. 18-35). On June 14, 2016, the Appeals Council denied Plaintiff's request to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-3). Plaintiff appealed that decision to the United States District Court for the Northern District of Ohio.

Meanwhile, on August 30, 2016, Plaintiff filed his application for SSI, alleging a disability onset date of April 4, 2015. (Tr. 741-746).

On June 28, 2017, Plaintiff's appeal from the denial of his application for DIB was decided, and his application was remanded back to the Social Security Administration based on the Magistrate Judge's recommendation that "[t]he ALJ's invalidation of George's IQ scores at Step Three was not supported by substantial evidence and did not apply the applicable regulatory standards." *George v. Comm'r of Soc. Sec.*, No. 1:16-CV-2044, 2017 WL 2805169, at *13 (N.D. Ohio June 15, 2017), *report and recommendation adopted*, 2017 WL 2804947 (N.D. Ohio June 28, 2017). On remand, Plaintiff's DIB and SSI claims were consolidated. (Tr. 432, 448, 573).

Plaintiff participated in a new hearing on February 16, 2018, was represented by counsel, and testified. (Tr. 456-504). On August 1, 2018, the ALJ found Plaintiff not disabled. (Tr. 432-448).

Plaintiff has appealed that decision and filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 11, 13 & 14). Plaintiff asserts a single assignment of error, asserting: the ALJ erred when considering the opinions of two consultative psychologists and a counselor. (R. 11).

2

## II. Evidence

**A. Relevant Medical Evidence**[1]

On May 31, 2013, Plaintiff was seen by consultative psychological examiner Paul Deardorff, Ph.D. (Tr. 329-336). Plaintiff reported graduating from high school and that he had been in special education classes. (Tr. 330). He reported using alcohol and marijuana. (Tr. 331). He once held a job for three years assembling eyeglasses, but reported he was terminated from that job for "running his mouth." *Id*. On mental status examination, Plaintiff appeared anxious, "but displayed no other eccentricities of manner." (Tr. 332). His receptive language skills were adequate, although his phraseology, grammatical structure and vocabulary suggested that he was "of borderline to low-average intelligence." *Id*. On mental status examination, George was oriented x 4, his remote recall was adequate, and his short-term memory was not strong. (Tr. 333). Plaintiff's judgment was deemed sufficient to make decisions affecting his future and to conduct his own living arrangements. *Id*. On the Wechsler Adult Intelligence Scale–IV ("WAIS-IV"), Plaintiff obtained a Verbal Comprehension score of 70; Perceptual Reasoning score of 71; Working Memory score of 74, Processing Speed score of 79; and a Full Scale IQ score of 68. (Tr. 334). Dr. Deardorff noted that Plaintiff's Working Memory score suggested that his attention and concentration skills were not strong, nor were his arithmetic skills or reasoning abilities. (Tr. 333). Dr. Deardorff observed that Plaintiff's test data suggests that he functions mildly to moderately below average in all areas assessed, and that Plaintiff tested lower than would be expected based on his clinical presentation. (Tr. 334). Dr. Deardorff noted that

---

[1] The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignments of error raised.

"emotional factors very likely interfered with his performance … as he appears to be of borderline to low-average intelligence." (Tr. 334). Dr. Deardorff's diagnoses were tic disorder; generalized anxiety disorder; mood disorder not otherwise specified; cannabis abuse in early remission; and alcohol abuse in partial remission; and assigned a Global Assessment of Functioning ("GAF") score of 51 indicative of moderate symptomology.[2] (Tr. 335). Dr. Deardorff completed a Functional Assessment, stating Plaintiff had no difficulty attending to, responding to, or following simple instructions, but his short-term memory and attention/concentration skills were not strong. (Tr. 336). In response to the request to describe George's abilities and limitations in responding appropriately to work pressures in a work setting and in dealing with supervisors and co-workers, Dr. Deardorff noted George was anxious throughout the visit. *Id*. Dr. Deardorff's remaining comments merely relayed George's statements concerning his past experiences with supervisors and work. *Id*.

On June 9, 2013, State Agency psychologist Roseann Umana, Ph.D., completed a mental residual functional capacity ("RFC") assessment. (Tr. 85-87). In the area of understanding and memory, Dr. Umana assessed George with moderate limitations in his ability to understand and remember detailed instructions, but no significant limitations with respect to work procedures or simple instructions. (Tr. 85). She explained that George could understand, remember, and carry out simple instructions. *Id*. In the area of sustained concentration and persistence, Dr. Umana

---

[2] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV"). An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM IV at 34. An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity ... and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

4

assessed moderate limitations with respect to George's ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, sustain an ordinary work routine, work in proximity to others, and complete a normal workday without interruptions from psychologically based symptoms. (Tr. 85-86). Dr. Umana explained that George had adequate concentration for routine, repetitive tasks, had limited social function but was, nevertheless, able to engage in superficial and occasional interactions. (Tr. 86). She further noted that George's stress tolerance was limited, but that he could adapt to work settings in which duties are routine and predictable. *Id*. In the area of social interaction, Dr. Umana assessed moderate limitations in George's ability to: interact appropriately with the general public, accept criticism from supervisors, interact with co-workers, and maintain socially appropriate behavior. *Id*. Dr. Umana explained that "[s]ocial functioning is limited, but adequate for superficial and occasional interactions." *Id*. In the area of adaptation, Dr. Umana assessed moderate limitations in George's ability to respond appropriately to changes in the work setting. (Tr. 86). Dr. Umana explained that George's "stress tolerance is limited," but he could "adapt to work settings in which duties are routine and predictable." (Tr. 87).

On September 19, 2013, State Agency psychiatrist Ermias Seleshi, M.D., completed a mental RFC assessment. (Tr. 100-102). In the area of understanding and memory, Dr. Seleshi assessed George with moderate limitations in his ability to understand and remember detailed instructions, but no significant limitations with respect to work procedures or simple instructions. (Tr. 100). In the area of sustained concentration and persistence, Dr. Seleshi assessed moderate limitations with respect to George's ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, sustain an ordinary work routine, work in proximity to others, and complete a normal workday without interruptions

5

from psychologically based symptoms. (Tr. 101). Dr. Seleshi explained that George could "perform 2-3 step SRT's without strict, fast-paced production requirements." *Id*. In the area of social interaction, Dr. Seleshi assessed moderate limitations in George's ability to interact appropriately with the general public, accept criticism from supervisors, interact with co-workers, and maintain socially appropriate behavior. *Id*. Dr. Seleshi explained that "[s]ocial functioning is limited, but adequate for superficial and occasional interactions with co-workers, supervisors and the general public." *Id*. In the area of adaptation, Dr. Seleshi assessed moderate limitations in George's ability to respond appropriately to changes in the work setting. (Tr. 102). Dr. Seleshi explained that George "can adapt to work settings in which duties are routine and predictable." *Id*.

In January 2014, Plaintiff underwent a consultative evaluation performed by Todd Hendrix, Ph.D., PCC-S. (Tr. 351). On mental status examination, Plaintiff had excellent grooming and hygiene, a cooperative demeanor, but was somewhat flat and restricted. (Tr. 352). Dr. Hendrix administered the WAIS-IV intelligence test, and Plaintiff obtained a Verbal Comprehension score of 68; Perceptual Reasoning score of 75; Working Memory score of 74; Processing Speed score of 76; and a Full Scale IQ score of 68. (Tr. 353). All results fell in either the "Low" or "Borderline" range. *Id.* Based on the results of the Adaptive Behavior Assessment System-II exam, which was completed by Plaintiff's father, Plaintiff demonstrates extremely low levels of overall adaptive behavior. (Tr. 355). On the Woodcock-Johnson-III test, Plaintiff's scores fell in the borderline or "low average" range. (Tr. 357). The screening tool for bipolar disorder, MDQ, was positive and implied a high likelihood that Plaintiff met the diagnostic criteria for bipolar disorder. (Tr. 361). In emotional functioning, Dr. Hendrix noted that: "[w]ith respect to negative impression management, there are subtle suggestions that [Plaintiff] attempted to portray himself

6

in a negative or pathological manner in particular areas, although this pattern does not necessarily indicate a level of impression management that would render the test results uninterpretable. This over-representation of symptoms may reflect an attempt to malinger or a cry for help." (Tr. 358). Based on the tests results, Dr. Hendrix opined that a diagnosis of "intellectual disability, mild" would be appropriate, and that a diagnosis of "bipolar II disorder, mild" appears to be more appropriate than intermittent explosive disorder. (Tr. 362).

On April 28, 2014, counselor Brenda Dillere, LPCC, completed a mental impairment questionnaire indicating she began seeing Plaintiff in February of 2013. (Tr. 363). Plaintiff's diagnoses included ADHD, a tic disorder, intermittent explosive disorder, and anxiety. *Id*. Ms. Dillere described Plaintiff's primary symptoms as difficulty with comprehension, verbal expression, and inattention leading to anxiety symptoms. (Tr. 363). She noted triggers include anxiousness around strangers; Plaintiff has concrete thinking; and he was very uncomfortable traveling independently. *Id*. Ms. Dillere indicated Plaintiff's illness restricted daily activities due to Plaintiff's limited cognitive ability and impacted his ability to sustain concentration and attention resulting in frequent failure to complete tasks. Ms. Dillere noted that Plaintiff had a history of ADHD medication that was discontinued on June 24, 2013. (Tr. 364). Ms. Dillere checked a box on the questionnaire indicating Plaintiff was living in a "highly supportive and protective setting," which helps attenuate some of Plaintiff's more severe symptoms. *Id*. By way of explanation, Ms. Dillere wrote: "Yes—client stated 'I'd go nuts' if he didn't have his father, his aunt." *Id*. Ms. Dillere opined Plaintiff was not able to function in a competitive work setting. *Id*. Ms. Dillere opined Plaintiff would be absent from work more than three times a month due to his impairments and treatments. (Tr 365). In a separate form completed the same date, Ms. Dillere indicated Plaintiff had marked difficulties in maintaining social functioning and marked

difficulties in maintaining concentration, persistence, or pace; and moderate restriction of activities of daily living. (Tr 366).

On August 14, 2014, George reported to his counselor, Gary Wiley, that he was working in landscaping two days a week and wanted to work full-time. (Tr. 381). His mood was good, his affect was congruent, his speech was normal, he was oriented x 4, and Plaintiff had clear thought process, fair insight and judgment, and intact memory and concentration. *Id*.

On October 21, 2014, George reported being happier, no arguments, and better concentration on Abilify. (Tr. 370). He again was in a good mood, his affect was congruent, his speech was normal, he was oriented x 4, he had clear thought process, his insight and judgment had improved to good, and he had intact memory/concentration. *Id*.

On August 25, 2015, George's mental status examination was within normal limits, he was working part-time, his speech was more spontaneous, his insight/judgment were fair, and he did not want to increase the dosage of his Abilify medication. (Tr. 877).

On November 30, 2016, State Agency psychologist Irma Johnston, Psy. D., completed a mental RFC assessment. (Tr. 588-590). In the area of understanding and memory, Dr. Johnston assessed George with moderate limitations in his ability to understand and remember detailed instructions, but no significant limitations with respect to work procedures or simple instructions. (Tr. 588-589). She explained that George "retains the ability to understand and recall instructions for simple, routine, and repetitive tasks." (Tr. 589). In the area of sustained concentration and persistence, Dr. Johnston assessed moderate limitations with respect to George's ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others, and complete a normal workday without interruptions from psychologically based symptoms. (Tr. 589). Dr. Johnston explained that

8

George "retains the ability to complete simple, routine, and repetitive tasks, in a static work environment." *Id*. In the area of social interaction, Dr. Johnston assessed moderate limitations in George's ability to interact appropriately with the general public and accept instructions or criticism from supervisors. (Tr. 589-590). Dr. Johnston explained that George "retains the ability to interact with others occasionally and superficially. (Tr. 590). In the area of adaptation, Dr. Johnston assessed moderate limitations in George's ability to respond appropriately to changes in the work setting. (Tr. 590). Dr. Johnston explained that George retains the ability to perform simple, routine and repetitive tasks in a static work environment "where changes are infrequent and clearly explained, where pace is not fast, and where there are no strict time or production quotas." *Id*.

Counseling records from December 20, 2016, indicate Plaintiff had spent all the money he inherited and that he had "no motivation to work." (Tr. 887).

On April 4, 2017, State Agency psychologist Katherine Fernandez, Psy. D., completed a mental RFC assessment that affirmed Dr. Johnston's findings. (Tr. 606-608).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-step process.

20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent him from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent him from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

## IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since April 1, 2009, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: borderline intellectual functioning, learning disorder, attention deficit hyperactivity disorder (ADHD), tic disorder, intermittent explosive disorders, oppositional defiant disorder, anxiety and bipolar disorder (20 CFR 404.1520(c) and

      416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he cannot climb ladders, ropes, or scaffolds; he must avoid hazards such as unprotected heights and moving mechanical machinery; he cannot perform commercial driving; he can perform simple routine tasks and make simple work-related decisions; he can tolerate frequent interaction with supervisors, occasional interaction with coworkers, and no interaction with members of the general public; he can relate with others on a superficial basis, meaning he cannot perform arbitration, mediation, confrontation, negotiation, or supervision of others; he can tolerate a relatively static work environment, meaning one with no more than occasional change and with such changes being explained in advance; and he can tolerate a work environment that does not include strict production requirements or fast pace.

6. The claimant is capable of performing past relevant work as a laborer, salvage. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2009, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 435-448).

### V. Law and Analysis

**A. Standard of Review**

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look

into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id*.) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.  Plaintiff's Assignment of Error**

In the sole assignment of error, Plaintiff asserts the ALJ failed to adequately consider and weigh the opinions of consultative psychologists Drs. Deardorff and Hendrix, as well as the opinion one of his counselors, Ms. Dillere. (R. 11, PageID# 966-972).

Courts have held that "the regulation requiring an ALJ to provide 'good reasons' for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one non-treating source's opinion over another." *Williams v. Colvin*, 2015 WL 5165458 at *5 (N.D. Ohio, Sept. 2, 2015) (*citing Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496 (6th Cir. 2006); *accord Chandler v. Comm'r of Soc. Sec.*, 2014 WL 2988433 at *8 (S.D. Ohio, July 1, 2014) ("the ALJ is not required to give 'good reasons' for rejecting a nontreating source's opinions in the same way as must be done for a treating source"). While a claimant may disagree with the ALJ's explanation as to why little weight was assigned to a non-

12

treating medical source, such a disagreement with the ALJ's rationale does not provide a basis for remand. *See, e.g.*, *Steed v. Colvin*, 2016 WL 4479485 (N.D. Ohio Aug. 25, 2016) (McHargh, M.J.). Instead, an ALJ, when arriving at the RFC assessment, "must always consider and address medical source opinions [and] [i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184 at *7 (July 2, 1996); *see also Puckett v. Colvin*, 2014 WL 1584166 at *9 (N.D. Ohio April 21, 2014) (Vecchiarelli, M.J.) (explaining that, although the ALJ was *not* required to evaluate opinions of consultative examiners with the same standard of deference as would apply to an opinion of a treating source, he was required to "acknowledge that [the examiners'] opinions contradicted his RFC finding and *explain* why he did not include their limitations in his determination of Plaintiff's RFC") (emphasis added).

The ALJ addressed the opinions of the two non-treating consultative examiners, Dr. Deardorff and Dr. Hendrix as follows:

> Claimant participated in his fourth intelligence testing in May 2013 during a consultative examination. He obtained a verbal comprehension score of 70, a perceptual reasoning index score of 71, a working memory index score of 74, a processing speed index score of 79, and a full scale IQ score of 68 (Exhibit 7F/6). The consultative psychological examiner, Paul Deardorff, Ph.D., indicated that the claimant's tested IQ "is lower than would be expected on the basis of his clinical presentation. Emotional factors very likely interfered with his performance on this measure as he appears to be of borderline to low-average intelligence." (Exhibit 7F /6).
>
> Furthermore, in January 2014, the claimant underwent intelligence testing with Todd Hendrix, Ph.D. The claimant He [sic] obtained a verbal comprehension score of 68 a perceptual reasoning index score of 75, a working memory index score of 74, a processing speed index score of 76, and a full scale IQ score of 68 (Exhibit 9F/3). Although Dr. Hendrix indicated that the results of the assessment are considered valid and an accurate reflection of his current level of functioning, Dr. Hendrix, also indicated that there were subtle suggestions that the claimant "attempted to portray himself in a negative or pathological manner in particular areas," and that "[t]his overrepresentation of symptoms may reflect all [sic]

13

attempt to malinger or a cry for help." (Exhibit 9F/3, 8). Dr. Hendrix further noted that the claimant's presentation was consistent with a diagnosis of mild intellectual disability, mild bipolar disorder, the clinical scales suggested a person with a history of polysubstance abuse, and that his substance abuse likely causes severe disruptions in his social relationships, work performance, and possible health complications.

\*\*\*

In May 2013, the claimant underwent a consultative examination, and intelligence testing with clinical psychologist Dr. Deardorff (Exhibit 7F). On examination, the claimant was anxious, but cooperative, alert and oriented, and did not display any other autonomic or motoric indications of anxiety. On examination, the claimant completed mental status tasks related to cognitive functioning, insight and judgment, but demonstrated difficulty with short-term memory, simple calculation, comparative and abstract thinking, and multi-step problems. His intelligence testing yielded a verbal scale score of 70, and a full scale IQ score of 68. Based on his presentation, Dr. Deardorff diagnosed the claimant with a tic disorder, generalized anxiety disorder, mood disorder- not otherwise specified, and cannabis and alcohol abuse in early remission. He assessed the claimant with a GAF rating of 51, which indicates moderate symptoms (Exhibit 7F/7).

The claimant underwent a psychiatric evaluation with Dr. Hendrix in January 2014, during which the claimant completed intelligence testing (Exhibit 9F). Claimant had at least three DUIs and was under a 10 [y]ear license suspension. On examination, the claimant had flat and blunted affect, and reported feelings of social isolation, but was oriented and denied symptoms of depression, suicidal and homicidal ideations, demonstrated fair insight and the ability to think abstractly with no deficits noted in his recent or remote memory. Dr. Hendrix noted that the claimant's vocabulary, receptive and expressive language skills appeared to be significantly below average compared to his peers. Intelligence testing yielded verbal and full scale scores of 68. Dr. Hendrix diagnosed the claimant with mild intellectual disability, but noted that the claimant did not appear to demonstrate symptoms of either ADHD or tick disorder. Furthermore, Dr. Hendrix diagnosed the claimant with mild bipolar disorder, and recommended that the claimant receive ongoing therapy, substance abuse education, and a referral to the Bureau of Vocational Rehabilitation to assist with vocational training and placement (Exhibit 9F /11-12).

\*\*\*

Consultative examiner Dr. Deardorff opined that the claimant might have difficulty managing funds prudently due to his limited arithmetic reasoning skills and substance abuse. In addition, Dr. Deardorff observed that the claimant presented as anxious throughout the examination, but had no difficulty attending

>or responding to simple questions or following simple instructions, although he had difficulty with inattention, concentration, and short-term memory function (Exhibit 7F). The undersigned gives great weight to Dr. Deardorff's opinion and observations of the claimant, because his thorough examination of the claimant supports his opinion and observation. Additionally, the claimant's treatment records from Far West Center corroborate Dr. Deardorff's, findings, namely the claimant's substance abuse issues, and difficulties with inattention and concentration (Exhibit SF, 8F, 12F).

(Tr. 438. 441, 443).

First, the ALJ clearly did not ignore the opinions of Dr. Deardorff or Dr. Hendrix, but rather discussed them at length. The ALJ ascribed "great weight" to Dr. Deardorff's opinion, as he did to all four of the State Agency psychological consultant opinions.[3] (Tr. 442-443, 445). Second, while both Dr. Deardorff and Dr. Hendrix opined that Plaintiff had low to borderline intelligence, the opinions are largely bereft of any specific statements regarding any specific vocational or work-related functional limitations that would arise as a result of their examinations.[4] Moreover, Plaintiff has not identified any actual conflict between any aspect of Dr. Deardorff or Dr. Hendrix's opinions with the limitations set forth set forth in the RFC. While Plaintiff suggests that Dr. Deardorff's testing showed that he had weak attention and concentration, falling in the 4th percentile, and slow processing speed, falling in the 8th percentile, it is not at all apparent that these test results are inherently inconsistent with the considerable

---

[3] The ALJ did not ascribe a label for the weight ascribed to Dr. Hendrix's opinion such as "little," "some," "partial," "considerable," "great," or any of the other myriad of adjectives the court has seen over the years. These labels are not defined in the regulations, and Plaintiff has not identified any authority suggesting that failure to affix such a label to a medical opinion renders and ALJ's explanation with respect to that opinion deficient.

[4] Other observations, such as the Plaintiff being "anxious," do not translate into specific functional limitations. The ALJ also found that Plaintiff's anxiety disorder was a severe impairment (Tr. 435), and undoubtedly several of the non-exertional limitations contained in the RFC are designed to account for Plaintiff's anxiety and other mental limitations. (Tr. 438-439).

15

non-exertional limitations set forth in the RFC. The same deficiency occurs in Plaintiff's argument with respect to Dr. Hendrix. Plaintiff simply points to the low math, reading, writing, and spelling scores, without drawing the court's attention to any specific limitation assessed by Dr. Hendrix that is incompatible with the RFC. Consequently, Plaintiff has not established that the ALJ omitted or rejected any limitations assessed by either Dr. Deardorff or Dr. Hendrix. As such, Plaintiff's argument is not persuasive.

Furthermore, assuming for the sake of argument only that: (1) some inconsistency exists between the RFC and the opinions of Dr. Deardorff or Dr. Hendrix; and (2) the resolution of that inconsistency is not explicitly addressed in the decision, a remand would not be necessary. The ALJ assigned great weight to the opinions of the four State Agency psychological consultants—Drs. Seleshi, Umana, Johnston and Fernandez. (Tr. 442, 445). State agency doctors are considered highly-qualified experts in disability evaluation, and the ALJ must consider their evidence. 20 C.F.R. §§ 404.1513a(b)(1); 404.1527(e); 416.913a(b)(1); 416.927(e). Though generally more weight is accorded to an examining source over those of a non-examining source, the ALJ is not prohibited from adopting the findings of a non-examining source. *See generally Ealy v. Comm'r*, 594 F.3d 504, 514-515 (6th Cir. 2010); *Smith v. Comm'r*, 482 F.3d 873, 875 (6th Cir. 2007). Plaintiff cites no law suggesting that an ALJ may not credit a State Agency psychologist over a one-time examining psychologist, but there is authority refuting such a proposition. "[I]t is not a *per se* error of law, as [claimant] suggests, for the ALJ to credit a nonexamining source over a nontreating source." *Norris v. Comm'r of Soc. Sec.*, 461 Fed. App'x 433, 439 (6th Cir. 2012); *accord Moscorelli*, 2016 WL 4486851 at *3.

A decision from the Southern District of Ohio, *Lowther v. Comm'r of Soc. Sec.*, No. 2:15-cv-3010, 2016 WL 7111604 at *7 (S.D. Ohio, Dec. 7, 2016), *adopted by* 2017 WL 25551 (Jan. 2,

16

2017), reasoned that where there was no opinion from a treating source with a longitudinal picture of a claimant's health, each medical source opinion was based on a limited amount of evidence. *Lowther*, 2016 WL 7111604 at *7. The *Lowther* court reasoned that the ALJ's decision to place more weight on the conclusions of a non-examining State Agency consultant, who reviewed the record, than those of two consultative examining psychologists "was within the permissible 'zone of choice' afforded to an ALJ." *Id.* (citations omitted).

This court agrees with the sound reasoning of the *Lowther* decision, and finds that the ALJ did not err by assigning greater weight to the non-examining State Agency opinions than the two one-time examining opinions of Drs. Deardorff and Hendrix. First, it bears noting that State Agency psychologists often have the benefit of having a fuller record. Indeed, all four State Agency opinions post-date the consultative evaluation of Dr. Deardorff, and two of the four opinions post-date the evaluation of Dr. Hendrix. In fact, Dr. Johnston and Dr. Fernandez's opinions had the benefit of approximately two to three years of additional treatment records. (Tr. 29-30). Thus, if any inconsistency can be discerned between the consultative examinations and the State Agency opinions, it can reasonably be inferred from the decision that the ALJ resolved that inconsistency in favor of the State Agency psychologists. *See, e.g., Martin v. Comm'r of Soc. Sec.*, 170 Fed. App'x 369, 373 (6th Cir. 2006) ("The ALJ had the duty to resolve conflicts in medical evidence"); *Crum v. Sullivan*, 921 F.2d 642, 645 (6th Cir. 1990); *see generally Webb v. Comm'r*, 368 F.3d 629, 633 (6th Cir. 2004) (ALJ's responsibility to evaluate medical evidence and claimant's testimony to assess RFC). "It is the duty of the ALJ, as the trier of fact, to resolve conflicts in the medical evidence." *Hensley v. Astrue*, No. 12-106, 2014 WL 1093201 at *4 (E.D. Ky. Mar. 14, 2014) *citing Richardson v. Perales*, 402 U.S. 389, 399 (1971)). "It is the ALJ's place, and not the reviewing court's, to resolve conflicts in evidence." *Collins v. Comm'r of Soc.*

*Sec.*, 357 Fed. App'x 663, 670 (6th Cir. 2009) (citations omitted).

In summary, the ALJ's decision adequately addressed the consultative examinations performed by Drs. Deardorff and Hendrix.

Plaintiff also takes issue with the ALJ's explanation as to the weight assigned to Ms. Dillere, an "other" source. (R. 11, PageID# 970-972). Ms. Dillere is identified in the record as a "PCC," a professional clinical counselor. (Tr. 365). It is beyond dispute that Ms. Dillere, as a professional clinical counselor, does not constitute an "acceptable medical source" under both the regulations and under case law. 20 C.F.R. § 416.902(a); *see, e.g., Gonzalez v. Comm'r of Soc. Sec.*, No. 5:14cv2322, 2015 WL 8483167 at \*\*6-7 (N.D. Ohio Dec. 10, 2015) (Knepp, M.J.) ("a licensed professional clinical counselor … is 'not an acceptable medical source under the regulations'"); *Duff v. Comm'r of Soc. Sec.*, No. 5:14cv1293, 2015 WL 2250396 at \*3 (N.D. Ohio May 13, 2015) (finding the ALJ properly classified a clinical counselor as a non-acceptable medical source) (Baughman, M.J.); *Hyland v. Comm'r of SSA*, No. 1:12cv02173, 2013 WL 4784706 at \*9 (N.D. Ohio Sept. 5, 2013) (Burke, M.J.) (same); *Orleck v. Colvin*, No. 3:15-CV-279, 2016 WL 4035192, at \*7 (S.D. Ohio July 28, 2016) ("a Licensed Professional Clinical Counselor, is not an acceptable medical source and instead falls under the category of 'other sources.'"), *report and recommendation adopted*, 2016 WL 4400311 (S.D. Ohio Aug. 17, 2016).

Although Ms. Dillere does not qualify as an "acceptable medical source" under the regulations, it is less clear whether a clinical counselor is properly considered a non-acceptable "medical source," 20 C.F.R. § 416.902(i) or a "nonmedical source." 20 C.F.R. § 416.902(j). The former includes individuals "licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law," while the latter includes educational personnel, including counselors, as well as public and private social welfare agency personnel.

*Id.* The distinction, however, appears to be immaterial, as the updated regulations call for the same standards of consideration and articulation for "[o]pinions from medical sources who are not acceptable medical sources and from nonmedical sources." 20 C.F.R. § 416.927(f)(1) & (2). The regulations state that "[t]he adjudicator generally should explain the weight given to opinions from these sources *or* otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. § 416.927(f)(2) (emphasis added).

The ALJ sufficiently complied with the directive of § 416.927(f)(2) and explained the weight given to Ms. Dillere's opinion as follows:

> Ms. Brenda Dillere, MA,. LPCC., one of the claimant's counselors, opined that the claimant has difficulty with comprehension, verbal expression, and inattention, which causes anxiety symptoms (Exhibit 10F/1, 12F/26). Ms. Dillere opined that social situations, dealing with others, travel, and stress trigger the claimant's symptoms, and that his mental impairments restrict his daily activities, and his abilities to sustain concentration and attention resulting in frequent failure to complete task (Exhibit 10F/2; 12F/27). Ms. Dillere opined that the claimant lives in a highly supportive and protective setting, which helps to attenuate some of his severe symptoms, and that the claimant is unable to function in a competitive work setting on an eight-hour per day, five days per week basis. Furthermore, Ms. Dillere opined that the claimant's symptoms would cause him to be absent from work more than three times per month (Exhibit 10F/2-3; 12F/27-28). She opined that the claimant has generalized anxiety disorder characterized by motor tension, apprehensive expectation, and vigilance and scanning; and that the claimant is moderately restricted in activities of daily living, markedly restricted in social functioning and concentration, persistence or pace, and mildly restricted in repeated episodes of decompensation or extended duration (Exhibit l0F/4; 12F/30). The undersigned gives some weight to the opinions of Ms. Dillere, because she a [sic] counselor and has developed a longitudinal treatment history with the claimant. The undersigned also notes that Ms. Dillere indicated that the claimant lives in a "highly supportive setting" (Exhibit 10F/2), but he does not live in a group home or residential facility. He lives with relatives.

(Tr. 443-444).

The ALJ's explanation was sufficient to satisfy the articulation required by the regulations with respect to non-medical or other medical sources. Plaintiff's brief identifies no deficiency in the ALJ's explanation other than the assertion that it is unclear why the ALJ did not accept Ms. Dillere's belief that Plaintiff would be absent three times per month due to his impairments. (R. 11, PageID# 971-972). But such argument fails because, as explained above, the ALJ assigned "great weight" to four separate medical opinions from State Agency psychologists or psychiatrists, who do qualify as acceptable medical sources. Even if the court were to construe the ALJ's explanation with respect to Ms. Dillere's opinion deficient, the ALJ's discussion of the evidence in its totality ensures that a subsequent reviewer can follow the adjudicator's reasoning, and the ALJ plainly decided to credit the opinions of the four State Agency medical sources over the conflicting aspects of an "other" source's opinion.

## VI. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be AFFIRMED.

s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: December 31, 2019

**OBJECTIONS**
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the district court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981);** *Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**